**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **GARETT LUCYK**, individually and on behalf of all other similarly situated individuals,<br><br>    Plaintiff,<br><br>v.<br><br>**MATERION BRUSH INC.** and **MATERION CORPORATION**,<br><br>    Defendants. | Case No.:<br><br>**COLLECTIVE AND CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiff GARETT LUCYK ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, hereby brings this Collective and Class Action Complaint against Defendants MATERION BRUSH INC. and MATERION CORPORATION (hereinafter collectively referred to as "Defendants"), and states as follows:

## INTRODUCTION

1. This is a collective and class action brought pursuant to 29 U.S.C. § 216(b) and Fed. R. Civ. P. 23 by Plaintiff, individually and on behalf of all similarly situated persons employed by Defendants, arising from Defendants' willful violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the Ohio Minimum Fair Wage Standards Act, Ohio Rev. Code § 4111 *et seq.*, the Ohio Prompt Pay Act, Ohio Rev. Code § 4113.15, and common law.

2. Materion Corporation, through its wholly owned subsidiaries, is an integrated producer of high-performance advanced engineered materials used in a variety of electrical, electronic, thermal, and structural applications with $1.2 billion in net sales in 2019. The company was incorporated in Ohio in 1931 and has approximately 2,600 employees. Its products are sold

into numerous end markets, including semiconductor, industrial, aerospace and defense, automotive, energy, consumer electronics, and telecom and data center.

3.     Materion Corporation, through its wholly owned subsidiaries, employs hourly production employees, including Plaintiff, to manufacture metal alloys containing beryllium.

4.     Plaintiff and the similarly situated production employees are and were employed in Materion Corporation's manufacturing facilities in Albuquerque, New Mexico; Bloomfield, Connecticut; Brewster, New York; Buffalo, New York; Delta, Utah; Elmore, Ohio; Fremont, California; Lincoln, Rhode Island; Lorain, Ohio; Milwaukee, Wisconsin; Reading, Pennsylvania; Santa Clara, California; Tucson, Arizona; Westford, Massachusetts; Wheatfield, New York; and Windsor, Connecticut.

5.     Due to the hazardous nature of beryllium, Defendants require Plaintiff and the production employees to wear company-issued protective clothing and safety gear during their work shifts in order to protect them from inhaling or contacting beryllium in the air or on surfaces and to comply with federal and state governmental safety and health regulations and mandates.

6.     The company-issued protective clothing and safety gear include "brush blues" (which consists of long pants and long sleeve button up shirts), underwear (for men), undershirts, socks, metatarsal shoes/boots, belts, face shields, respirators or battery operated helmets, safety glasses, ear plugs, gloves, and skull caps (hereinafter referred to as "personal protective equipment" or "PPE").

7.     Defendants require Plaintiff and the production employees to change into ("don") and change out of ("doff") the PPE before and after their work shifts in designated locations at Defendants' manufacturing facilities.

8.     Defendants also require Plaintiff and the production employees to shower in

designated showering areas after their work shifts but before leaving the facility.

9.     The process of donning and doffing the PPE is compensable because Defendants and government regulations require Plaintiff and the production employees to wear the PPE during their work shifts and to don and doff the PPE at the worksite.

10.     Additionally, the PPE is an integral and indispensable part of Plaintiff's and the production employees' principal work activities, as Plaintiff and the production employees cannot safely or lawfully perform their production activities without wearing the PPE.

11.     Plaintiff and the production employees spend substantial amounts of time each day donning and doffing PPE and walking to and from the locker room and the production area before and after their work shifts.

12.     Defendants, however, do not pay Plaintiff and the production employees for all of this time. Instead, Defendants pay Plaintiff and the production employees based on their *scheduled* shift start times and end times (e.g. 7:00 a.m. to 3:30 p.m., with an unpaid 30-minute lunch period), not the time that Plaintiff and the production employees perform their first and last principal activities of the workday.

13.     Consequently, Defendants do not pay Plaintiff and the production employees for all compensable time, including overtime.

14.     Defendants require Plaintiff and the production employees to don and doff the same or substantially similar PPE; and Defendants compensate Plaintiff and the production employees in the same manner.

15.     The individuals Plaintiff seeks to represent in this action are current and former production employees who work(ed) for Defendants at their manufacturing facilities and who are/were required to don and doff protective clothing and safety gear before the start of and after

the end of their work shifts.

16. Defendants knew or could have easily determined how long it takes Plaintiff and the production employees to complete their donning, doffing, walking and showering activities, and Defendants could have properly compensated Plaintiff and the putative collective/class members for this pre- and post-shift work, but deliberately chose not to.

17. Plaintiff seeks a declaration that his rights, and the rights of the putative collective/class members were violated, an award of unpaid wages, an award of liquidated damages, injunctive and declaratory relief, attendant penalties, and an award of attorneys' fees and costs to make them whole for damages they suffered, and to ensure that they and future workers will not be subjected by Defendants to such illegal conduct in the future.

## **JURISDICTION**

18. This Court has subject matter jurisdiction over Plaintiff's FLSA claim under 28 U.S.C. § 1331 because Plaintiff's claim raises a federal question under 29 U.S.C. § 201 *et seq.*

19. Additionally, this Court has jurisdiction over Plaintiff's FLSA claim under 29 U.S.C. § 216(b), which provides that suit under the FLSA "may be maintained against any employer … in any Federal or State court of competent jurisdiction."

20. Moreover, this Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). This is a class action in which the aggregate claims of the individual Class members exceed the sum value of $5,000,000 exclusive of interest and costs, there are believed to be in excess of 100 class members, and at least some class members have a different citizenship than Defendants.

21. Defendants' annual sales exceed $500,000, and Defendants have more than two employees; thus, the FLSA applies in this case on an enterprise basis. Defendants' employees,

including Plaintiff, engage in interstate commerce or in the production of goods for commerce; therefore, they are also covered by the FLSA on an individual basis.

22.     This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because the state law claims and the federal claim are so closely related that they form part of the same case or controversy under Article III of the United States Constitution.

23.     This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

24.     This Court has personal jurisdiction over Defendants because Defendants are incorporated in the state of Ohio and maintain their principal place of business in the state of Ohio.

## VENUE

25.     Venue is proper in the Northern District of Ohio under 28 U.S.C. §§ 1391 (b)(1) and (2) because Defendants reside in this District and employ Plaintiff and other production employees in this District.

## INTRADISTRICT ASSIGNMENT

26.     A substantial part of the events or omissions giving rise to the claims alleged herein occurred at Defendants' Elmore, Ohio manufacturing facility; therefore, this action is properly assigned to the Western Division.

## PARTIES

27.     Plaintiff GARETT LUCYK is an Ohio resident who has worked for Defendants as an hourly production employee at Defendants' Elmore, Ohio manufacturing facility since June 2018. Defendants pay Plaintiff $26.17 per hour, plus shift premium pay, nondiscretionary incentive compensation, and additional premium pay due to the hazards of working at the facility during the COVID-19 pandemic. *See* **Ex. A**, Plaintiff's April 24, 2020 Earnings Statement.

Throughout his employment with Defendants, Plaintiff has typically worked up to 40 or more hours per week and has worked overtime during numerous workweeks. Plaintiff signed a consent form to join this collective action lawsuit. **Ex. B**.

28.  Defendant MATERION BRUSH INC. is an Ohio corporation (Entity Number: 144720) with its principal executive office located at 6070 Parkland Boulevard, Mayfield Heights, Ohio 44124. Its registered agent for service of process is Gregory R. Chemnitz, c/o Brushed Materials, 6070 Parkland Boulevard, Mayfield Heights, Ohio 44124. Defendant MATERION BRUSH INC. is a subsidiary of Defendant MATERION CORPORATION.

29.  Defendant MATERION CORPORATION is an Ohio corporation (Entity Number: 1199752) with its principal executive office located at 6070 Parkland Boulevard, Mayfield Heights, Ohio 44124. Its registered agent for service of process is CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, Ohio 43219.

## GENERAL ALLEGATIONS

A.  **Defendants' Operations and Manufacturing Facilities**

30.  Materion Corporation, through its wholly owned subsidiaries, is an integrated producer of high-performance advanced engineered materials used in a variety of electrical, electronic, thermal, and structural applications with $1.2 billion in net sales in 2019. The company was incorporated in Ohio in 1931 and has approximately 2,600 employees. Its products are sold into numerous end markets, including semiconductor, industrial, aerospace and defense, automotive, energy, consumer electronics, and telecom and data center.

31.  Materion Corporation's businesses are organized under four reportable segments: Performance Alloys and Composites, Advanced Materials, Precision Coatings, and Other.[1]

---

[1] The Other segment is comprised of unallocated corporate costs.

32. The Performance Alloys and Composites (PAC) segment provides advanced engineered solutions comprised of beryllium and non-beryllium containing alloy systems and custom engineered parts in strip, bulk, rod, plate, bar, tube, and other customized shapes. These products are produced at Materion Corporation's manufacturing facilities in Delta, Utah; Elmore, Ohio; Fremont, California; Lincoln, Rhode Island; Lorain, Ohio; Reading, Pennsylvania; and Tucson, Arizona.

33. The Advanced Materials segment provides advanced chemicals, microelectronics packaging, precious metal, non-precious metal, and specialty metal products, including vapor deposition targets, frame lid assemblies, clad and precious metal pre-forms, high temperature braze materials, and ultra-pure wire shapes. These products are produced at Materion Corporation's manufacturing facilities in Albuquerque, New Mexico; Brewster, New York; Buffalo, New York; Milwaukee, Wisconsin; Santa Clara, California; and Wheatfield, New York.

34. The Precision Coatings segment provides sputter-coated precision thin film coatings and optical filter materials and high-performance sputter-coated precision flexible thin film materials. These products are produced at Materion Corporation's manufacturing facilities in Bloomfield, Connecticut; Tyngsboro, Massachusetts; and Windsor Connecticut.

35. Plaintiff and the similarly situated production employees are and were employed in Materion Corporation's manufacturing facilities in Albuquerque, New Mexico; Bloomfield, Connecticut; Brewster, New York; Buffalo, New York; Delta, Utah; Elmore, Ohio; Fremont, California; Lincoln, Rhode Island; Lorain, Ohio; Milwaukee, Wisconsin; Reading, Pennsylvania; Santa Clara, California; Tucson, Arizona; Westford, Massachusetts; Wheatfield, New York; and Windsor, Connecticut.

**B.** **Defendants Require Plaintiff and the Production Employees to Utilize Company-Issued PPE during their Work Shifts in Order to Protect the Production Employees from the Harmful Effects of Beryllium**

36.     Due to the hazardous nature of their operations, Defendants require Plaintiff and the production employees to utilize company-issued protective clothing and safety gear during their work shifts in order to protect Plaintiff and the production employees from inhaling or contacting beryllium in the air or on surfaces and to comply with federal and state governmental safety and health regulations and mandates.

37.     The company-issued protective clothing and safety gear include "brush blues" (which consists of long pants and long sleeve button up shirts), underwear (for men), undershirts, socks, metatarsal shoes/boots, belts, face shields, respirators or battery operated helmets, safety glasses, ear plugs, gloves, and skull caps (hereinafter referred to as "personal protective equipment" or "PPE").

38.     Defendants require Plaintiff and the production employees to don and doff the PPE before and after their work shifts in designated locations at Defendants' manufacturing facilities.

39.     Defendants prohibit Plaintiff and the production employees from donning or doffing the PPE at home.

40.     Defendants prohibit Plaintiff and the production employees from taking the PPE home with them or otherwise removing the PPE from Defendants' manufacturing facilities. *See* **Ex. C**, Materion Employee Handbook, Section 5.8, p. 85 ("No work clothing of any kind, furnished by the company, may be worn or taken from the plant premises").

41.     Defendants furnish Plaintiff and the production employees with freshly laundered protective clothing each workday. *Id.* ("The company will launder all clothing and towels. Shoes, when worn out, will be destroyed and replaced").

42.     Defendants prohibit Plaintiff and the production employees from leaving the locker

room and walking to the production area without wearing their protective clothing and metatarsal shoes/boots.

43.     Defendants prohibit Plaintiff and the production employees from entering certain areas of the manufacturing facility, including the production area, without wearing the appropriate PPE.

44.     Defendants prohibit Plaintiff and the production employees from leaving the production area and walking back to the locker room without wearing their protective clothing and metatarsal shoes/boots.

45.     In addition to requiring Plaintiff and the production employees to don and doff PPE before and after their work shifts in designated locations at Defendants' manufacturing facilities, Defendants require Plaintiff and the production employees to shower in designated showering areas after their work shifts but before leaving the facility.

46.     Defendants prohibit Plaintiff and the production employees from leaving the manufacturing facility without doffing the PPE, showering, and changing into a clean pair of clothes.

47.     Plaintiff and the production employees spend substantial amounts of time each day donning and doffing PPE and walking to and from the locker room and the production area before and after their work shifts, and showering after their work shifts.

48.     Defendants, however, do not pay Plaintiff and the production employees for all of this time.

49.     Instead, Defendants pay Plaintiff and the production employees based on their *scheduled* shift start times and end times (e.g. 7:00 a.m. to 3:30 p.m., with an unpaid 30-minute lunch period), not the time that Plaintiff and the production employees perform their first and last

principal activities of the workday.

50.     Consequently, Defendants do not pay Plaintiff and the production employees for all compensable time, including overtime.

**C.     Pre-Shift Donning and Walking Activities**

51.     Before their scheduled shifts and before beginning their production activities, Plaintiff and the production employees are required to undertake the following essential work tasks in chronological order:

- Upon arriving at the facility, Plaintiff and the production employees must walk through a turnstile, swipe their key card at the security gate, and then walk into the security office and have their temperature taken;

- After leaving the security office, the production employees must walk to the exit of the boot locker room, place their lunch bin on a shelf just outside the exit of the boot locker room, and then embark on a 50-yard walk to the locker room;

- After entering the locker room, the production employees must retrieve their freshly laundered brush blues, underwear, undershirts and socks from the locker room clothing rack and bins;

- After retrieving their protective clothing, the production employees must grab a pair of rubber gloves and carry the items to their personal locker, unlock the combination lock, remove their personal clothing and their shoes and stow the items in their locker, and then put on their brush blues, underwear, undershirts and socks;

- After readying and donning their protective clothing, the production employees must grab a pair of flip flops from their locker, put on their flip flops and their rubber gloves, close their locker and lock the combination lock, and then walk to the boot locker room;

- After entering the boot locker room, the production employees must walk to their personal locker, remove their flip flops and stow them in their locker, grab their belt from their locker and put on their belt, and then put on and lace up their metatarsal shoes/boots;

- After putting on and lacing up their metatarsal shoes/boots, the production employees must retrieve any other necessary work items from their locker (such as pens, pencils and notepads) and attach the items to their protective clothing or put the items in their pockets;

- Then, the production employees must remove their rubber gloves, place them in a designated trash bin, retrieve their lunch bin from the shelf as they exit the boot locker room, and then embark on a four to five minute walk to the production area to receive their

work instructions and complete their pre-shift donning activities;[2]

- After walking to the production area and receiving their work instructions, the production employees must retrieve and put on additional items of safety gear, including a respirator or battery-powered helmet, nitrile gloves, ear plugs, and, depending on their work assignment for the day, A6 cut resistant gloves, face shields, and/or skull caps.

52.     The pre-shift donning and walking process at the Elmore, Ohio facility takes substantial time on a daily basis, ranging from 15 to 20 minutes per shift.

53.     Plaintiff and the production employees are not properly paid for this time because Defendants require Plaintiff and the production employees to report to their work stations and begin their production activities no later than six minutes after the start of their scheduled work shifts, meaning that Plaintiff and the production employees must arrive to work approximately 9 to 15 minutes *before* the start of their scheduled shifts in order to complete their pre-shift donning and walking activities. *See* **Ex. C**, Materion Employee Handbook, Section 5.8, p. 86 (showing that production employees working a 7:00 a.m. to 3:30 p.m. shift, with an unpaid 30-minute lunch period, are required to change clothes and arrive at the work area at 7:06 a.m.).

54.     Consequently, Plaintiff and the production employees perform pre-shift work in the range of 9 to 15 minutes per shift.

**D.      Post-Shift Walking, Doffing and Showering Activities**

55.     After completing their production activities and after removing their respirators or battery-powered helmets and other items of safety gear and placing them in designated bins, Plaintiff and the production employees are required to undertake the following essential work tasks in chronological order:

---

[2] During the wintertime, the production employees must undertake the additional step of walking to the coat locker room, retrieving a work coat from the bin in the coat locker room, and putting on the work coat before embarking on the four to five minute walk to the production area.

- Leave the production area and embark on a four to five minute walk to the boot locker room;[3]

- After entering the boot locker room, the production employees must grab a pair of rubber gloves, walk to their locker, put on the rubber gloves, untie and remove their metatarsal shoes/boots and remove their belts and stow the items in their locker, and then remove their brush blues, underwear, undershirts and socks and place the items in designated bins;

- After removing their protective clothing and placing them in designated bins, the production employees must put on their flip flops, walk to the shower area, remove their rubber gloves and place them in a designated trash bin, and then grab a wash cloth on their way to the shower;

- Next, the production employees must enter the shower and thoroughly cleanse and rinse themselves in order to remove any traces of beryllium from their hair, nails and skin;

- After showering, the production employees must grab a freshly laundered towel, dry themselves off, put on their flip flops, and walk from the shower area back to the locker room;

- After entering the locker room, the production employees must walk to their locker room stall, unlock the combination lock, remove their flip flops and stow them in their locker, and put on a clean pair of clothes and shoes;

- After changing into their clothes, the production employees must close their locker door, lock the combination lock, and place their used towel in a designated towel bin in the locker room as they exit the locker room door;

- Finally, the production employees must walk to the exit of the boot locker room, retrieve their lunch bin from the shelf just outside the exit of the boot locker room, and then walk to the security gate and swipe their key card as they walk through the turnstile and exit the facility.

56.      The post-shift walking, doffing and showering process at the Elmore, Ohio facility takes substantial time on a daily basis, ranging from 15 to 20 minutes per shift.

57.      Plaintiff and the production employees are not properly paid for this time because Defendants do not permit Plaintiff and the production employees to leave the production area until

---

[3] During the wintertime, the production employees must walk from the production area to the coat locker room, remove their work coat, and then place the work coat in a designated bin in the coat locker room before proceeding to the boot locker room.

12 minutes before the end of their scheduled work shifts, meaning that Plaintiff and the production employees perform post-shift work in the range of 3 to 10 minutes per shift. *See* **Ex. C**, Materion Employee Handbook, Section 5.8, p. 86 (showing that production employees working a 7:00 a.m. to 3:30 p.m. shift, with an unpaid 30-minute lunch period, are not permitted to leave the work area to take a shower and change clothes until 3:18 p.m.).

**E.**      **Defendants' Timekeeping System Fails to Properly Account for Plaintiff's and the Production Employees' Donning, Doffing, Walking and Showering Activities**

58.      During their shifts, Plaintiff and the production employees are required to enter their time into Defendants' Kronos time-keeping system using a computer terminal in the production area, but again, this time is based on their *scheduled* shift start times and end times (e.g. 7:00 a.m. to 3:30 p.m., with an unpaid 30-minute lunch period), not the time that Plaintiff and the production employees perform their first and last principal activities of the workday. *Id.*, Section 5.2, p. 1 ("All employees scheduled on straight shift jobs will receive a 30 minute unpaid lunch and receive 10 hours of straight time pay for each regularly scheduled shift").

59.      Defendants require Plaintiff and the production employees to report to their work stations and begin their production activities no later than six minutes after the start of their scheduled work shifts; and Defendants do not permit Plaintiff and the production employees to leave the production area to take a shower and change clothes more than 12 minutes before the end of their scheduled work shifts. *Id.*, Section 5.8, p. 85 ("All hourly rate and weekly salaried employees furnished clothing shall be allowed six (6) minutes at the start of their shift to change clothes, and twelve (12) minutes at the end of their shifts to take a shower and change clothes").

60.      However, as described above, it takes Plaintiff and the production employees significantly longer than 18 minutes to complete their donning, doffing, walking and showering activities.

61.     Consequently, Defendants' timekeeping system fails to account for all of the time Plaintiff and the production employees spend donning and doffing PPE, walking to and from the locker room and production area, and showering.

**F.      Donning and Doffing PPE at the Worksite are Principal Work Activities and are Compensable under the FLSA**

62.     Defendants require Plaintiff and the production employees to wear the PPE during their work shifts and to shower at Defendants' facility before leaving work in order to prevent chronic beryllium disease (CBD) and to comply with federal and state governmental safety and health regulations and mandates.[4]

63.     Additionally, the PPE is an integral and indispensable part of Plaintiff's and the production employees' principal work activities, as Plaintiff and the production employees cannot safely or lawfully perform their production activities without wearing the PPE.

64.     Donning and doffing protective clothing and safety gear are principal activities under the Portal-to-Portal Act, 29 U.S.C. § 254, and thus time spent in those activities, as well as any walking and waiting time that occurs after the employee engages in his first principal activity and before he finishes his last principal activity, is part of a "continuous workday" and is compensable under the FLSA.

65.     The determination of whether donning and doffing a safety uniform is compensable begins with *Steiner v. Mitchell*, 350 U.S. 247 (1956), the seminal case on the subject. In *Steiner*, the Supreme Court held that donning and doffing uniforms was compensable when employees

---

[4] Inhaling or contacting beryllium can cause an immune response that results in an individual becoming sensitized to beryllium. *See* Federal Register Volume 82, Number 5, Occupational Exposure to Beryllium, available at *https://www.osha.gov/laws-regs/federalregister/2017-01-09*. Individuals with beryllium sensitization are at risk for developing a debilitating disease of the lungs called chronic beryllium disease (CBD) if they inhale airborne beryllium after becoming sensitized. *Id*. Beryllium-exposed workers may also develop other adverse health effects such as acute beryllium disease and lung cancer. *Id*.

handling dangerous chemicals in a wet storage battery factory were "compelled by circumstances, including vital considerations of health and hygiene, to change clothes and to shower in facilities which state law requires their employer to provide." *Id.* at 248.

66.     The factory workers in *Steiner* were exposed to high levels of lead particles (dust and fumes), which "permeate[d] the entire plant and everything and everyone in it." *Id.* at 249. Lead dust attached to the skin, hair, clothing and shoes of the employees, and presented significant risks to family members of the workers because toxic particles could be "brought home in the workers' clothing or shoes." *Id.* at 250.

67.     Consequently, the workers were issued old but clean clothes on-site, and were required to don and doff the clothes at the factory and shower on the premises before leaving in order to minimize health risks to themselves and others. *Id.* at 255. Under these circumstances, the Court had "no difficulty" concluding that these dress-related activities were compensable under the FLSA. *Id.*

68.     Following the Supreme Court's decision in *Steiner*, the Department of Labor ("DOL") issued regulations providing further guidance about the types of dress-related activities that are compensable under the FLSA. One such regulation, 29 C.F.R. § 790.8(c), describes "principal activity" as follows:

> Among the activities included as an integral part of a principal activity are those closely related activities which are indispensable to its performance. If an employee in a chemical plant, for example, cannot perform his principal activities without putting on certain clothes, changing clothes on the employer's premises at the beginning and end of the workday would be an integral part of the employee's principal activity. On the other hand, if changing clothes is merely a convenience to the employee and not directly related to his principal activities, it would be considered as a 'preliminary' or 'postliminary' activity rather than a principal part of the activity.

69.     More recently, in an advisory memorandum regarding the Supreme Court's decision in *IBP v. Alvarez*, 546 U.S. 21 (2005), the DOL reiterated its view that the FLSA requires

compensation for donning and doffing safety gear when the donning and doffing activities must be performed at work. The DOL opined:

> Therefore, the time, no matter how minimal, that an employee is required to spend putting on and taking off gear on the employer's premises is compensable 'work' under the FLSA. … However, donning and doffing of required gear is within the continuous workday only when the employer or the nature of the job mandates that it take place on the employer's premises. It is our longstanding position that if employees have the option and the ability to change into the required gear at home, changing into that gear is not a principal activity, even when it takes place at the [worksite].

Wage & Hour Adv. Mem. No. 2006-2 (May 31, 2006), available at *https://www.dol.gov/whd/FieldBulletins/AdvisoryMemo2006_2.htm#_ftnref2*.

70.     In light of the Supreme Court's opinion in *Steiner*, numerous Circuit Courts have endorsed the compensability of donning and doffing safety gear. For example, in *Tum v. Barber Foods, Inc.*, 360 F.3d 274, 278 (1st Cir. 2004), the First Circuit noted with approval the district court's opinion regarding the compensability of donning and doffing safety gear when wearing such gear is required by the employer and/or government regulation:

> The district court found that the donning and doffing of required gear is an integral and indispensable part of Employees' principal activities. *See generally Steiner v. Mitchell,* 350 U.S. 247, 76 S.Ct. 330, 100 L.Ed. 267 (1956) (holding that activities should be considered integral and indispensable when they are part of the principal activities for the particular job tasks); *Mitchell v. King Packing Co.,* 350 U.S. 260, 76 S.Ct. 337, 100 L.Ed. 282 (1956). We agree with the district court's conclusion as to the required gear. In the context of this case, Employees are required by Barber Foods and or government regulation to wear the gear. Therefore, these tasks are integral to the principal activity and therefore compensable. *See Alvarez v. IBP, Inc.,* 339 F.3d 894, 903 (9th Cir. 2003) (holding that donning and doffing which is both required by law and done for the benefit of employer is integral and indispensable part of the workday); *cf.* 29 C.F.R. § 1910.132(a).

*Id*.

71.     In *Franklin v. Kellogg Co.,* 619 F.3d 604 (6th Cir. 2010), the Sixth Circuit considered the issue of employee compensation for time spent donning and doffing food protective clothing and safety gear at the beginning and the end of work shifts. The protective gear at issue

included hair and beard nets, safety glasses, ear plugs, and "bump caps." *Id.* at 608. The Sixth Circuit applied the *Steiner* test, asking whether the activities of donning and doffing were an "integral and indispensable" part of the principal activity of the employment. *Id.* at 619-20. The Sixth Circuit answered this question in the affirmative, reasoning that the activities were required by the manufacturer, and ensured untainted products and safe and sanitary working conditions. *Id.* at 620.

72.     In a case involving the donning and doffing of protective gear at a meat processing plant, *Alvarez v. IBP, Inc.,* 339 F.3d 894 (9th Cir. 2003), *aff'd,* 546 U.S. 21 (2005), the Ninth Circuit also applied the *Steiner* test. The court considered whether these activities of donning and doffing at the beginning and end of a work shift were "integral and indispensable" to the principal activity of the employment, inquiring whether the activities were "necessary to the principal work performed and done for the benefit of the employer." *Id.* at 902-03. The Ninth Circuit concluded that the "integral and indispensable" test set forth in *Steiner* was satisfied with regard to the donning and doffing of all the protective gear at issue. *Id.* at 903.

## G.     The Production Employees' Walking Time is Compensable Because it Occurs After the Beginning of the their First Principal Activity and Before the End of their Last Principal Activity

73.     The time spent by Plaintiff and the production employees walking to and from the locker room and production area is compensable because it occurs after donning their PPE and before doffing their PPE.

74.     On appeal to the Supreme Court, the employers in *Alvarez* did not challenge the Ninth Circuit's holding that, in light of *Steiner,* donning and doffing of protective equipment is compensable under the Portal Act. *Alvarez,* 546 U.S. at 32. Instead, the employers appealed a separate ruling regarding the compensability of walking time. *Id.* The Supreme Court held that walking time is compensable if it occurs after the beginning of the employee's first principal

activity and before the end of the employee's last principal activity. *Id.* at 37.

75.     In the wake of the Supreme Court's decision in *Alvarez*, the DOL issued an advisory memorandum stating, in pertinent part,

> The Supreme Court's unanimous decision in *Alvarez* holds that employees who work in meat and poultry processing plants must be paid for the time they spend walking between the place where they put on and take off protective equipment and the place where they process the meat or poultry. The Court determined that donning and doffing gear is a "principal activity" under the Portal to Portal Act, 29 U.S.C. 254, and thus time spent in those activities, as well as any walking and waiting time that occurs after the employee engages in his first principal activity and before he finishes his last principal activity, is part of a "continuous workday" and is compensable under the Fair Labor Standards Act (FLSA), 29 U.S.C. 201 et seq.

Wage & Hour Adv. Mem. No. 2006-2 (May 31, 2006), available at *https://www.dol.gov/whd/FieldBulletins/AdvisoryMemo2006_2.htm#_ftnref2* (footnote omitted).

## H.     The Production Employees' Showering Activities are Compensable Because Showering is Required by the Nature of their Work and Significantly Reduces Health Risks

76.     Plaintiff's and the production employees' showering activities are also compensable because Defendants require Plaintiff and the production employees to shower before leaving the facility in order to protect themselves and their families from the risks associated with beryllium exposure.

77.     In *Alvarez, supra*, the Supreme Court endorsed the compensability of post-shift showering activities where, like here, the employees were exposed to dangerously caustic and toxic materials:

> In 1955 … we were confronted with the question whether workers in a battery plant had a statutory right to compensation for the "time incident to changing clothes at the beginning of the shift and showering at the end, where they must make extensive use of dangerously caustic and toxic materials, and are compelled by circumstances, including vital considerations of health and hygiene, to change clothes and to shower in facilities which state law requires their employers to provide ...." *Steiner v. Mitchell,* 350 U.S. 247, 248, 76 S.Ct. 330, 100 L.Ed. 267 (1956). After distinguishing "changing clothes and showering under normal conditions" and

stressing the important health and safety risks associated with the production of batteries, *id.*, at 249, 76 S.Ct. 330, the Court endorsed the Court of Appeals conclusion that these activities were compensable under the FLSA.

*Alvarez*, 546 U.S. at 28. *See also Musch v. Domtar Industries, Inc.*, 587 F.3d 857, 859 (7th Cir. 2009) (Under the FLSA, an employee can be compensated for activities such as washing up or changing clothes if these activities are integral and indispensable to that employee's employment); *Dekeyser v. Thyssenkrupp Waupaca, Inc.*, No. 08-C-0488, 2015 WL 1014612, at *3 (E.D. Wis. Mar. 9, 2015) ("The standard is that the changing and showering is integral and indispensable if 'required by the nature of the work'—in other words, if 'changing clothes and showering at work will significantly reduce the risk to the health of the employee.'") (citation omitted).

## I.     Defendants' Regular Rate Violations

78.     Defendants pay Plaintiff and the production employees an hourly wage, plus shift premium pay, nondiscretionary incentive compensation, and additional premium pay due to the hazards of working at the facility during the COVID-19 pandemic.

79.     Under the FLSA, the "regular rate" at which an employee must be paid includes "**all remuneration** for employment paid to, or on behalf of, the employee," divided by hours worked in a workweek. 29 U.S.C. § 207(e) (emphasis added).

80.     Defendants violated the FLSA's overtime provisions, 29 U.S.C. § 207, by systematically failing to include all remuneration in Plaintiff's and the production employees' regular rates of pay when computing overtime pay, specifically, nondiscretionary incentive compensation and additional premium pay due to the hazards of working at the facility during the COVID-19 pandemic.

81.     Consequently, Plaintiff and the production employees are paid at artificially low overtime rates.

**J.**     **Defendants Breached Their Contractual Obligation to Pay Plaintiff and the Production Employees their Regular Hourly Rates for Each Hour Worked**

82.     In approximately June 2018, Defendants offered Plaintiff the opportunity to work for Defendants as an hourly production employee.

83.     In consideration for Plaintiff's work as an hourly production employee, Defendants promised to pay Plaintiff an hourly wage for each hour he worked for Defendants.

84.     In approximately June 2018, Plaintiff accepted Defendants' offer of employment and began working for Defendants, creating a valid contract between Defendants and Plaintiff whereby Defendants were obligated to pay Plaintiff his regular hourly rate of pay for each hour that he worked for Defendants, including the donning, doffing, walking and showering activities described herein.

85.     Throughout his employment with Defendants as an hourly production employee, Plaintiff performed all of the work required by Defendants, including the donning, doffing, walking and showering activities described herein. In performing this work, Plaintiff fulfilled all of his duties under the contract.

86.     However, throughout Plaintiff's entire employment with Defendants, Defendants repeatedly and systematically breached the contract by not paying Plaintiff his regular hourly rate of pay for the donning, doffing, walking and showering activities described herein.

87.     Defendants' failure to pay Plaintiff for each hour of work he performed and that was required of him as an hourly production employee was a material breach by Defendants.

88.     Because of Defendants' breaches, Plaintiff was deprived of wages owed to him under the contract, including unpaid "gap time" wages.[5]

_____

[5] "Gap time" refers to time that is not covered by the FLSA's overtime provisions because it does not exceed the overtime limit, and to time that is not covered by the FLSA's minimum wage provisions because, even though it is uncompensated, the employees are still being paid a

89. Upon information and belief, all of the other hourly production employees who worked for Defendants had a similar valid contract with Defendants.

90. Upon information and belief, Defendants repeatedly and systematically breached their contracts with all the other hourly production employees they employed in the same way that they breached their contract with Plaintiff.

91. Defendants' contractual promises to pay Plaintiff and each hourly production employee's applicable hourly rate for each hour worked is evidenced by, among other things, each earnings statement issued to Plaintiff and the hourly production employees.

92. Plaintiff and the hourly production employees are owed wages at their contractual hourly wage rates for the time that they worked off the clock during their employment with Defendants, including unpaid "gap time" wages.

93. Plaintiff and the hourly production employees earned these wages at the moment they performed the off-the-clock work; and the wages were due to be paid to Plaintiff and the hourly production employees no later than the pay day for the period in which the off-the-clock work was performed.

94. Despite the fact that Plaintiff and the hourly production employees performed the off-the-clock work before and after their scheduled shifts, these off-the-clock hours were not peripheral tasks for which they were owed additional compensation. Instead, the off-the-clock work, which was performed by Plaintiff and the hourly production employees pursuant to Defendants' express instructions, constituted principal work activities that were integral and indispensable to the hourly production employees' work; and Defendants were contractually obligated to pay the hourly production employees for this time at the regular hourly rates at which

---

minimum wage when their salaries are averaged across their actual time worked.

21

they were employed.

95.     The fact that Defendants deliberately chose not to compensate Plaintiff and the production employees for this work, and that the off-the-clock work was performed before and after the production employees' scheduled shifts, does not somehow relieve Defendants of their contractual obligations to pay the production employees for this time.

96.     Defendants were contractually obligated to pay Plaintiff and the production employees their regular rates of pay for *all hours worked*, including hours worked before after their scheduled work shifts.

**K.      Defendants Benefitted from the Unpaid Donning, Doffing, Walking and Showering Activities**

97.     At all relevant times, Defendants directed and directly benefited from the work performed by Plaintiff and similarly situated employees in connection with the above-described pre-shift and post-shift donning, doffing, walking and showering activities performed by Plaintiff and the production employees.

98.     At all relevant times, Defendants controlled the work schedules, duties, protocols, applications, assignments and employment conditions of Plaintiff and the production employees.

99.     At all relevant times, Defendants were able to track the amount of time Plaintiff and the production employees spent in connection with the pre-shift and post-shift donning, doffing, walking and showering activities. However, Defendants failed to do so and failed to pay Plaintiff and the production employees for all of the work they performed.

100.    At all relevant times, Plaintiff and the production employees were non-exempt employees, subject to the requirements of the FLSA and state wage and hour law.

101.    At all relevant times, Defendants used their attendance and adherence policies against Plaintiff and the production employees in order to pressure them into performing the pre-

shift and post-shift donning, doffing, walking and showering activities without pay.

102.    Defendants expressly trained and instructed Plaintiff and the production employees to begin performing the above-described pre-shift donning and walking activities *before* the start of their scheduled shifts, to ensure they were prepared to engage in their production activities no later than six minutes after their shifts began.

103.    At all relevant times, Defendants' policies and practices deprived Plaintiff and the production employees of wages owed for the pre-shift and post-shift donning, doffing, walking and showering activities they performed. Because Plaintiff and the production employees regularly worked 40 hours or more per week, Defendants' policies and practices also deprived them of overtime pay.

104.    Defendants knew or should have known that the time spent by Plaintiff and the production employees in connection with the pre-shift and post-shift donning, doffing, walking and showering activities was compensable under the law. Indeed, in light of the explicit DOL guidance and Supreme Court case law cited above, there is no conceivable way for Defendants to establish that they acted in good faith.

105.    Despite knowing Plaintiff and the production employees performed work before and after their scheduled work shifts, Defendants failed to make any effort to stop or disallow the pre- and post-shift work and instead suffered and permitted it to happen.

106.    Unpaid wages related to the pre-shift and post-shift work described herein are owed to Plaintiff and the production employees at the FLSA mandated overtime premium of one and one-half times the regular hourly rates at which they were employed because Plaintiff and the production employees regularly worked 40 hours or more per week.

## **FLSA COLLECTIVE ACTION ALLEGATIONS**

107.    Plaintiff brings this action pursuant to 29 U.S.C. § 216(b) of the FLSA on his own

behalf and on behalf of:

> *All current and former production employees who worked for Materion*
> *Corporation (or any of its wholly owned subsidiaries) at any of its manufacturing*
> *facilities during the last three years and who were required to don and doff*
> *protective clothing or safety gear before the start of and after the end of their*
> *shifts*.

(hereinafter referred to as the "FLSA Collective"). Plaintiff reserves the right to amend this

definition if necessary.

108.    Defendants are liable under the FLSA for, *inter alia*, failing to properly compensate

Plaintiff and other similarly situated production employees.

109.    Excluded from the proposed FLSA Collective are Defendants' executives and

administrative and professional employees, including computer professionals and outside

salespersons.

110.    Consistent with Defendants' policy and pattern or practice, Plaintiff and the FLSA

Collective were not paid premium overtime compensation when they worked over 40 hours in a

workweek.

111.    Defendants assigned and/or were aware of all of the work that Plaintiff and the

FLSA Collective performed.

112.    As part of their regular business practices, Defendants intentionally, willfully, and

repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA with respect to

Plaintiff and the FLSA Collective. This policy and pattern or practice includes, but is not limited

to:

> a.    Willfully failing to pay their employees, including Plaintiff and the FLSA
>        Collective, premium overtime wages for all hours worked in excess of 40
>        hours per workweek; and

b.      Willfully failing to record all of the time that their employees, including Plaintiff and the FLSA Collective, worked for the benefit of Defendants.

113.    Defendants are aware or should have been aware that federal law required them to pay Plaintiff and the FLSA Collective overtime premiums for all hours worked in excess of 40 per workweek.

114.    Defendants' unlawful conduct has been widespread, repeated, and consistent.

115.    A collective action under the FLSA is appropriate because the employees described above are "similarly situated" to Plaintiff under 29 U.S.C. § 216(b). The employees on behalf of whom Plaintiff brings this collective action are similarly situated because (a) they have been or are employed in the same or similar positions; (b) they were or are performing the same or similar job duties; (c) they were or are subject to the same or similar unlawful practices, policy, or plan; and (d) their claims are based upon the same factual and legal theories.

116.    The employment relationships between Defendants and every proposed FLSA Collective member are the same. The key issues - the amount of uncompensated pre-shift and post-shift donning, doffing, walking and showering time - do not vary substantially among the proposed FLSA Collective members.

117.    Many similarly situated current and former production employees have been underpaid in violation of the FLSA and would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

118.    Court-supervised notice should be sent to the FLSA Collective pursuant to 29 U.S.C. § 216(b).

119.    Those similarly situated employees are known to Defendants, are readily identifiable, and can be located through Defendants' records.

120.    Plaintiff estimates the proposed FLSA Collective, including both current and

former employees over the relevant period, will include hundreds of workers. The precise number of FLSA Collective members should be readily ascertainable from a review of Defendants' personnel and payroll records.

## RULE 23 OHIO CLASS ACTION ALLEGATIONS

121.     Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(3) on his own behalf and on behalf of:

> *All current and former production employees who worked for Materion Corporation (or any of its wholly owned subsidiaries) at any of its Ohio manufacturing facilities during the applicable statute of limitations period and who were required to don and doff protective clothing or safety gear before the start of and after the end of their shifts.*

(hereinafter referred to as the "Rule 23 Ohio Class"). Plaintiff reserves the right to amend the putative class definition if necessary.

122.     The Rule 23 Ohio Class members are so numerous that joinder of all Rule 23 Ohio Class members in this case would be impractical. Plaintiff reasonably estimates there are hundreds of Rule 23 Ohio Class members. Rule 23 Ohio Class members should be easy to identify from Defendants' computer systems and electronic payroll and personnel records.

123.     There is a well-defined community of interest among Rule 23 Ohio Class members and common questions of law and fact predominate in this action over any questions affecting individual Rule 23 Ohio Class members. These common legal and factual questions include, but are not limited to, the following:

   a.     Whether the time Rule 23 Ohio Class members spent on pre-shift and post-shift donning, doffing, walking and showering activities is compensable time; and

   b.     Whether Rule 23 Ohio Class members are owed wages for time spent performing pre-shift and post-shift donning, doffing, walking and showering activities, and if so, the appropriate amount thereof.

124.     Plaintiff's claims are typical of those of the Rule 23 Ohio Class in that he and all

other Rule 23 Ohio Class members suffered damages as a direct and proximate result of Defendants' common and systemic payroll policies and practices. Plaintiff's claims arise from the same policies, practices, promises and course of conduct as all other Rule 23 Ohio Class members' claims, and his legal theories are based on the same legal theories as all other Rule 23 Ohio Class members.

125.    Plaintiff will fully and adequately protect the interests of the Rule 23 Ohio Class and has retained counsel who are qualified and experienced in the prosecution of nationwide wage and hour class actions. Neither Plaintiff nor his counsel have interests that are contrary to, or conflicting with, the interests of the Rule 23 Ohio Class.

126.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because, *inter alia*, it is economically infeasible for Rule 23 Ohio Class members to prosecute individual actions of their own given the relatively small amount of damages at stake for each individual along with the fear of reprisal by their employer. Prosecution of this case as a Rule 23 Ohio Class action will also eliminate the possibility of duplicative lawsuits being filed in state and federal courts throughout Ohio.

127.    This case will be manageable as a Rule 23 Class action. Plaintiff and his counsel know of no unusual difficulties in this case, and Defendants have advanced, networked computer and payroll systems that will allow the class, wage, and damages issues in this case to be resolved with relative ease.

128.    Because the elements of Fed. R. Civ. P. 23(b)(3) are satisfied in this case, class certification is appropriate. *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) ("By its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action").

129. Because Defendants acted and refused to act on grounds that apply generally to the Rule 23 Ohio Class and declaratory relief is appropriate in this case with respect to the Rule 23 Ohio Class as a whole, class certification under Fed. R. Civ. P. 23(b)(2) is also appropriate.

**RULE 23 NATIONWIDE CLASS ACTION ALLEGATIONS**

130. Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(3) on his own behalf and on behalf of:

> *All current and former production employees who worked for Materion Corporation (or any of its wholly owned subsidiaries) at any of its manufacturing facilities during the applicable statute of limitations period and who were required to don and doff protective clothing or safety gear before the start of and after the end of their shifts.*

(hereinafter referred to as the "Rule 23 Nationwide Class"). Plaintiff reserves the right to amend the putative class definition if necessary.

131. The Rule 23 Nationwide Class members are so numerous that joinder of all Rule 23 Nationwide Class members in this case would be impractical. Plaintiff reasonably estimates there are hundreds of Rule 23 Nationwide Class members. Rule 23 Nationwide Class members should be easy to identify from Defendants' computer systems and electronic payroll and personnel records.

132. There is a well-defined community of interest among Rule 23 Nationwide Class members and common questions of law and fact predominate in this action over any questions affecting individual members of the Rule 23 Nationwide Class. These common legal and factual questions include, but are not limited to, the following:

    a.    Whether the time Rule 23 Nationwide Class members spent on pre-shift and post-shift donning, doffing, walking and showering activities is compensable time;

    b.    Whether Rule 23 Nationwide Class members are owed wages for time spent performing pre-shift and post-shift donning, doffing, walking and showering activities, and if so, the appropriate amount thereof; and

c.     Whether Defendants' non-payment of wages for all compensable time constitutes breach of contract or unjust enrichment.

133.    Plaintiff's claims are typical of the Rule 23 Nationwide Class members' claims because Plaintiff and all other Rule 23 Nationwide Class members suffered damages as a direct and proximate result of Defendants' common and systemic payroll policies and practices. Plaintiff's claims arise from the same policies, practices, promises and course of conduct as all other Rule 23 Nationwide Class members' claims, and his legal theories are based on the same legal theories as all other Rule 23 Nationwide Class members.

134.    Plaintiff will fully and adequately protect the interests of the Rule 23 Nationwide Class and has retained counsel who are qualified and experienced in the prosecution of nationwide wage and hour class actions. Neither Plaintiff nor his counsel have interests that are contrary to, or conflicting with, the interests of the Rule 23 Nationwide Class.

135.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because, *inter alia*, it is economically infeasible for Rule 23 Nationwide Class members to prosecute individual actions of their own given the relatively small amount of damages at stake for each individual along with the fear of reprisal by their employer. Prosecution of this case as a Rule 23 Class action will also eliminate the possibility of duplicative lawsuits being filed in state and federal courts throughout the nation.

136.    This case will be manageable as a Rule 23 Class action. Plaintiff and his counsel know of no unusual difficulties in this case, and Defendants have advanced, networked computer and payroll systems that will allow the class, wage, and damages issues in this case to be resolved with relative ease.

137.    Because the elements of Fed. R. Civ. P. 23(b)(3) are satisfied in this case, class certification is appropriate. *Shady Grove Orthopedic Associates, P.A.*, 559 U.S. at 398 ("By its

terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action").

138.   Because Defendants acted and refused to act on grounds that apply generally to the Rule 23 Nationwide Class and declaratory relief is appropriate in this case with respect to the Rule 23 Nationwide Class as a whole, class certification under Fed. R. Civ. P. 23(b)(2) is also appropriate.

**COUNT I**
**VIOLATION OF FLSA, 29 U.S.C. § 201 *et seq*.**
**FAILURE TO PAY OVERTIME WAGES**
**(29 U.S.C. § 216(b) Collective Action)**

139.   Plaintiff re-alleges and incorporates all previous paragraphs herein.

140.   At all times relevant to this action, Defendants were engaged in interstate commerce, or in the production of goods for commerce, as defined by the FLSA.

141.   At all times relevant to this action, Plaintiff and the FLSA Collective were "employees" of Defendants within the meaning of 29 U.S.C. § 203(e)(1) of the FLSA.

142.   Plaintiff and the FLSA Collective, by virtue of their job duties and activities actually performed, are all non-exempt employees.

143.   Plaintiff and the FLSA Collective either: (1) engaged in commerce; or (2) engaged in the production of goods for commerce; or (3) were employed in an enterprise engaged in commerce or in the production of goods for commerce.

144.   At all times relevant to this action, Defendants "suffered or permitted" Plaintiff and the FLSA Collective to work and thus "employed" them within the meaning of 29 U.S.C. § 203(g) of the FLSA.

145.   At all times relevant to this action, Defendants required Plaintiff and the FLSA Collective to perform unpaid off-the-clock work in connection with their donning, doffing, walking

and showering activities, but failed to pay these employees the federally mandated overtime compensation for the off-the-clock work.

146. The off-the-clock work performed every shift by Plaintiff and the FLSA Collective is an essential part of their jobs, and these activities and the time associated with these activities are not *de minimis*.

147. In workweeks where Plaintiff and other FLSA Collective members worked over 40 hours, the unpaid off-the-clock work time, and all other overtime, should have been paid at the federally mandated rate of one and one-half times each employee's regular hourly wage, including shift differential pay, nondiscretionary incentive pay, and all other non-excludable remuneration. 29 U.S.C. § 207.

148. Defendants' violations of the FLSA were knowing and willful. Defendants knew or could have determined how long it takes Plaintiff and the production employees to perform their off-the-clock work. Further, Defendants could have easily accounted for and properly paid Plaintiff and the FLSA Collective for these work activities, but deliberately chose not to.

149. The FLSA, 29 U.S.C. § 216(b), provides that as a remedy for a violation of the Act, an employee is entitled to his or her unpaid wages (including unpaid overtime), plus an additional equal amount in liquidated damages (double damages), plus costs and reasonable attorneys' fees.

**COUNT II**
**VIOLATIONS OF THE OHIO MINIMUM FAIR WAGE STANDARDS ACT**
**OHIO REV. CODE ANN. § 4111 *et seq*.**
**(On Behalf of the Rule 23 Ohio Class)**

150. Plaintiff re-alleges and incorporates all previous paragraphs herein.

151. At all times relevant to this action, Defendants were employers covered by the overtime and wage mandates of the Ohio Minimum Fair Wage Standards Act (the "Ohio Wage Act"), and Plaintiff was an employee entitled to the Ohio Wage Act's protections. *See* Ohio Rev.

Code Ann. § 4111.03.

152.     The Ohio Wage Act entitles employees to compensation for every hour worked in a workweek. *See* Ohio Rev. Code Ann. § 4111.01.

153.     The Ohio Wage Act entitles employees to overtime compensation at a rate equal to one and one-half times their regular rate of pay for all hours worked in excess of 40 hours per week. *See* Ohio Rev. Code Ann. § 4111.03.

154.     Defendants violated the Ohio Wage Act by regularly and repeatedly failing to pay Plaintiff for the time spent on the off-the-clock work activities described in this Complaint and by failing to include all remuneration when computing Plaintiff's regular rate of pay for purposes of overtime.

155.     As a result, Plaintiff has and will continue to suffer loss of income and other damages.

156.     Accordingly, Plaintiff is entitled to recover unpaid wages owed, plus costs and attorneys' fees, and other appropriate relief under the Ohio Wage Act at an amount to be proven at trial.

### COUNT III
### VIOLATIONS OF THE OHIO PROMPT PAY ACT
### OHIO REV. CODE ANN. § 4113.15
### (On Behalf of the Rule 23 Ohio Class)

157.     Plaintiff re-alleges and incorporates all previous paragraphs herein.

158.     Ohio Rev. Code Ann. § 4113.15(A) requires that employers pay their employees on or before the first day of each month wages earned during the first half of the preceding month ending with the 15th day thereof and pay their employees on or before the 15th day of each month wages earned during the second half of the preceding month.

159.     Ohio Rev. Code Ann. § 4113.15(B) requires that where wages remain unpaid for

30 days beyond a regularly scheduled payday and no contest, court order, or dispute accounts for the non-payment, the employee is entitled to liquidated damages in the amount of 6% or $200.00 per violation, whichever is greater.

160. No bona fide and legally cognizable dispute related to wages exists accounting for Defendants' failure to timely pay Plaintiff.

161. Accordingly, Plaintiff is entitled to recover the amount of damages due and owing from Defendants under Ohio Rev. Code Ann. § 4113.15(B).

**COUNT IV**
**BREACH OF CONTRACT**
**(On Behalf of the Rule 23 Nationwide Class)**

162. Plaintiff re-alleges and incorporates all previous paragraphs herein.

163. At all times relevant to this action, Defendants had a binding and valid contract with Plaintiff and every other Rule 23 Nationwide Class member to pay each employee for each hour they worked at a pre-established (contractual) regularly hourly rate in consideration of the work duties Plaintiff and the Rule 23 Nationwide Class members performed on Defendants' behalf.

164. Defendants' contractual promises to pay Plaintiff and each Rule 23 Nationwide Class member's applicable hourly rate is evidenced by, among other things, each earnings statement issued to Plaintiff and the Rule 23 Nationwide Class members.

165. Plaintiff and every other Rule 23 Nationwide Class member accepted the terms of Defendants' contractual promises and performed under the contract by doing their jobs and carrying out the work they performed each shift, including the unpaid off-the-clock work that was required of them, accepted by Defendants, and that they performed, in connection with the donning, doffing, walking and showering activities described herein.

166. By not paying Plaintiff and every other Rule 23 Nationwide Class member the

agreed upon hourly wage for the work they performed each shift in connection with the off-the-clock work they performed, Defendants systematically breached their contracts with Plaintiff and each Rule 23 Nationwide Class member.

167.     Plaintiff's and the Rule 23 Nationwide Class members' remedies under the FLSA are inadequate in this case to the extent Defendants paid them more than the federally mandated minimum wage of $7.25 per hour but less than 40 hours per week (i.e., pure "gap time" claims).

168.     As a direct and proximate result of Defendants' contractual breaches, Plaintiff and the Rule 23 Nationwide Class members have been damaged in an amount to be determined at trial.

### COUNT V
### UNJUST ENRICHMENT
### (On Behalf of the Rule 23 Nationwide Class)

169.     Plaintiff re-alleges and incorporates all previous paragraphs herein.

170.     This Count is pled in the alternative to Count IV, *supra*, pursuant to Fed. R. Civ. P. 8(d)(2)-(3).

171.     At all times relevant to this action, Defendants promised Plaintiff and every other Rule 23 Nationwide Class member a pre-established regular hourly rate in consideration of the work duties Plaintiff and the Rule 23 Nationwide Class members performed for the benefit of Defendants.

172.     Plaintiff and every other Rule 23 Nationwide Class member relied upon Defendants' promise for the pre-established regular hourly rate and performed by doing their jobs and carrying out their required work duties.

173.     By not paying Plaintiff and every other Rule 23 Nationwide Class member the agreed upon hourly wage for the off-the-clock work they performed each shift, Defendants were unjustly enriched.

174.     Plaintiff and the Rule 23 Nationwide Class members performed off-the-clock work

tasks at the request of, without objection by, and for the benefit of, Defendants.

175. Defendants received and accepted the above-referenced off-the-clock work services from Plaintiff and every other Rule 23 Nationwide Class member and enjoyed the benefits derived therefrom, including increased profits, without having paid for the same.

176. Upon information and belief, Defendants used the monies owed to Plaintiff and every other Rule 23 Nationwide Class member to finance their various business ventures or pay their equity owners.

177. Defendants have been unjustly enriched by the retention of monies received pursuant to the services Plaintiff and the Rule 23 Nationwide Class performed for Defendants' benefit, without having paid Plaintiff and the Rule 23 Nationwide Class for the same.

178. Plaintiff and the Rule 23 Nationwide Class suffered detriment due to Defendants' failure to pay them for the off-the-clock work described herein, in that Plaintiff and the Rule 23 Nationwide Class were deprived of the ability to utilize that time, effort and their resources in a profitable manner.

179. As a direct and proximate result of Defendants' actions, Plaintiff and every other Rule 23 Nationwide Class member suffered damages, including but not limited to, loss of wages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of the putative FLSA Collective and Rule 23 Classes, requests judgment as follows:

a. Certifying this case as a collective action under 29 U.S.C. § 216(b) with respect to Plaintiff's FLSA claim (Count I);

b. Certifying this action as a class action (for the Rule 23 Ohio Class) under Fed. R. Civ. P. 23(b)(2) and (b)(3) with respect to Plaintiff's Ohio state law claims (Counts II-III);

c. Certifying this action as a class action (for the Rule 23 Nationwide Class) under Fed. R. Civ. P. 23(b)(2) and (b)(3) with respect to Plaintiff's breach of contract and

unjust enrichment claims (Counts IV-V);

d.　　Ordering Defendants to disclose in computer format, or in print if no computer readable format is available, the names, addresses, email addresses, phone numbers and dates and location of employment of all FLSA Collective members, and permitting Plaintiff to send notice of this action to all those similarly situated individuals, apprising the FLSA Collective members of their rights by law to join and participate in this lawsuit;

e.　　Designating Plaintiff as the representative of the FLSA Collective and the Rule 23 Classes, and undersigned counsel as Class counsel for the same;

f.　　Declaring Defendants violated the FLSA and the DOL's attendant regulations as cited herein;

g.　　Declaring Defendants' violations of the FLSA were willful;

h.　　Declaring Defendants violated the Ohio Wage Act and the Ohio Prompt Pay Act;

i.　　Declaring Defendants' violations of the Ohio Wage Act and the Ohio Prompt Pay Act were willful;

j.　　Declaring Defendants breached their contracts with Plaintiff and the Rule 23 Nationwide Class members (or, in the alternative, that Defendants were unjustly enriched) by failing to pay them for each hour they worked at a pre-established (contractual) regularly hourly rate;

k.　　Granting judgment in favor of Plaintiff and against Defendants and awarding Plaintiff and the FLSA Collective and the Rule 23 Classes the full amount of damages and liquidated damages available by law;

l.　　Awarding reasonable attorneys' fees and costs incurred by Plaintiff in filing this action as provided by statute;

m.　　Awarding pre- and post-judgment interest to Plaintiff on these damages; and

n.　　Awarding such other and further relief as this Court deems appropriate.

## **JURY DEMAND**

Plaintiff, individually and on behalf of all others similarly situated, by and through his attorneys, hereby demands a trial by jury under Fed. R. Civ. P. 38.

Dated: October 14, 2020

Respectfully Submitted,

/s/ *Rod M. Johnston*
Matthew L. Turner
Kevin J. Stoops (will *pro hac vice*)
Rod M. Johnston (will *pro hac vice*)
SOMMERS SCHWARTZ, P.C.
One Towne Square, 17th Floor
Southfield, Michigan 48076
Phone: (248) 355-0300
Email: mturner@sommerspc.com
Email: kstoops@sommerspc.com
Email: rjohnston@sommerspc.com

*Attorneys for Plaintiff and the Putative*
*Collective/Class Members*